(Slip Opinion) OCTOBER TERM, 2009 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KAWASAKI KISEN KAISHA LTD. ET AL. *v.* REGAL-BELOIT CORP. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–1553. Argued March 24, 2010—Decided June 21, 2010*

Respondents (cargo owners) delivered to petitioners in No. 08–1553 ("K" Line) goods for shipping from China to inland United States destinations. "K" Line issued them four through bills of lading, *i.e.,* bills of lading covering both the ocean and inland portions of transport in a single document. As relevant here, the bills contain a "Himalaya Clause," which extends the bills' defenses and liability limitations to subcontractors; permit "K" Line to subcontract to complete the journey; provide that the entire journey is governed by the Carriage of Goods by Sea Act (COGSA), which regulates bills of lading issued by ocean carriers engaged in foreign trade; and designate a Tokyo court as the venue for any dispute. "K" Line arranged the journey, subcontracting with petitioner in No. 08–1554 (Union Pacific) for rail shipment in the United States. The cargo was shipped in "K" Line vessels to California and then loaded onto a Union Pacific train. A derailment along the inland route allegedly destroyed the cargo. Ultimately, the Federal District Court granted the motion of Union Pacific and "K" Line to dismiss the cargo owners' suits against them based on the parties' Tokyo forum-selection clause. The Ninth Circuit reversed, concluding that that clause was trumped by the Carmack Amendment governing bills of lading issued by domestic rail carriers, which applied to the inland portion of the shipment.

*Held:* Because the Carmack Amendment does not apply to a shipment originating overseas under a single through bill of lading, the parties'

———————

\*Together with No. 08–1554, *Union Pacific Railroad Co.* v. *Regal-Beloit Corp. et al.,* also on certiorari to the same Court.

agreement to litigate these cases in Tokyo is binding.  Pp. 4–21.

(a) COGSA, which "K" Line and Union Pacific contend governs these cases, requires a carrier to issue to the cargo owner a bill containing specified terms.  It does not limit the parties' ability to adopt forum-selection clauses.  It only applies to shipments from United States ports to foreign ports and vice versa, but permits parties to extend certain of its terms "by contract" to cover "the entire period in which [the goods] would be under [a carrier's] responsibility, including [a] period of inland . . . transport."  *Norfolk Southern R. Co.* v. *James N. Kirby, Pty Ltd.*, 543 U. S. 14, 29.  The Carmack Amendment, on which respondents rely, requires a domestic rail carrier that "receives [property] for transportation under this part" to issue a bill of lading.  49 U. S. C. §11706(a).  "[T]his part" refers to the Surface Transportation Board's (STB's) jurisdiction over domestic rail transportation.  See §10501(b).  Carmack assigns liability for damage on the rail route to "receiving rail carrier[s]" and "delivering rail carrier[s]," regardless of which carrier caused the damage.  §11706(a).  Its purpose is to relieve cargo owners "of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods."  *Reider* v. *Thompson*, 339 U. S. 113, 119.  Thus, it constrains carriers' ability to limit liability by contract, §11706(c), and limits the parties' choice of venue to federal and state courts.  §11706(d)(1).  Pp. 4–7.

(b) In *Kirby,* as in these cases, an ocean shipping company issued a through bill of lading that extended COGSA's terms to the inland segment, and the property was damaged during the inland rail portion.  This Court held that the through bill's terms governed under federal maritime law, notwithstanding contrary state laws, 543 U. S., at 23–27, explaining that "so long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce," *id.*, at 27, and adding that "[a]pplying state law . . . would undermine the uniformity of general maritime law," *id.,* at 28, and defeat COGSA's apparent purpose "to facilitate efficient contracting in contracts for carriage by sea," *ibid.*  Here, as in *Kirby,* "K" Line issued through bills under COGSA, in maritime commerce, and extended its terms to the journey's inland domestic segment.  Pp. 7–8.

(c) The Carmack Amendment's text, history, and purposes make clear that it does not require a different result.  Pp. 8–21.

(1) Carmack divides the realm of rail carriers into receiving, delivering, and connecting rail carriers.  Its first sentence requires a compliant bill of lading (1) if a rail carrier provid[es] transportation or service subject to the [STB's] jurisdiction" and (2) if that carrier "receives" the property "for transportation . . . ."  11706(a).  It thus requires the receiving rail carrier—but not the delivering or connect-

ing rail carrier—to issue a bill of lading. This conclusion is consistent with statute's text and this Court's precedent. See *St. Louis, I. M. & S. R. Co.* v. *Starbird*, 243 U. S. 592, 595, 604. A receiving rail carrier is the initial carrier, which "receives" the property for domestic rail transportation at the journey's point of origin. If the Carmack's bill of lading requirement referred not to the initial carrier, but to any carrier "receiving" the property from another carrier, then every carrier during the shipment would have to issue its own separate bill. This would be contrary to Carmack's purpose of making the receiving and delivering carriers liable under a single, initial bill for damage caused by any carrier within a single course of shipment. This conclusion is consistent with *Mexican Light & Power Co.* v. *Texas Mexican R. Co.*, 331 U. S. 731, where the Court held that a bill of lading issued by a subsequent rail carrier when the "initial carrier" has issued a through bill is "void" unless it "represents the initiation of a new shipment," *id.,* at 733–734. And *Reider, supra,* is not to the contrary. There, absent a through bill of lading, the original journey from Argentina terminated at the port of New Orleans, and the first rail carrier in the United States was the receiving rail carrier for Carmack purposes. *Id.,* at 117. Carmack's second sentence establishes that it applies only to transport of property for which a receiving carrier is required to issue a bill of lading, regardless of whether that carrier actually issues such a bill. See §11706(a). Thus, Carmack applies only if the journey begins with a receiving rail carrier that had to issue a compliant bill of lading, not if the property is received at an overseas location under a through bill that covers transport into an inland location in this country. The initial carrier in that instance receives the property at the shipment's point of origin for overseas multimodal import transport, not domestic rail transport. Carmack did not require "K" Line to issue bills of lading because "K" Line was not a receiving rail carrier. That it chose to use rail transport to complete one segment of the journey under its "essentially maritime" contracts, *Kirby, supra,* at 24, does not put it within Carmack's reach. Union Pacific, which the cargo owners concede was a mere delivering carrier that did not have to issue its own Carmack bill of lading, was also not a receiving rail carrier under Carmack. Because the Ninth Circuit ignored Carmack's "receive[d] . . . for transportation" limitation, it reached the wrong conclusion. Its conclusion is also an awkward fit with Carmack's venue provisions, which presume that the receiving carrier obtains the property in a judicial district within the United States. If "K" Line were a receiving carrier in a case with a "point of origin" in China, there would be no place under Carmack to sue "K" Line, since China is not within a judicial district "of the United States or in a State Court."

Syllabus

§11706(d)(1).  Pp. 8–15.

(2) Carmack's statutory history supports this conclusion.  None of its legislative versions—the original 1906 statute or the amended 1915, 1978, or 1995 ones—have applied to the inland domestic rail segment of an import shipment from overseas under a through bill. Pp. 15–17.

(3) This interpretation also attains the most consistency between Carmack and COGSA.  Applying Carmack to the inland segment of an international carriage originating overseas under a through bill would undermine Carmack's purposes, which are premised on the view that a shipment has a single bill of lading and any damage is the responsibility of both receiving and delivering carriers.  Under the Ninth Circuit's interpretation, there might be no venue in which to sue the receiving carrier.  That interpretation would also undermine COGSA and international, container-based multimodal transport: COGSA's liability and venue rules would apply when cargo is damaged at sea and Carmack's rules almost always would apply when the damage occurs on land.  Moreover, applying Carmack to international import shipping transport would undermine COGSA's purpose "to facilitate efficient contracting in contracts for carriage by sea." *Kirby, supra,* at 29.  The cargo owners' contrary policy arguments are unavailing.  Pp. 17–20.

557 F. 3d 985, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, BREYER, and ALITO, JJ., joined.  SOTOMAYOR, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 08–1553 and 08–1554

KAWASAKI KISEN KAISHA LTD., ET AL., PETITIONERS
08–1553          *v.*
REGAL-BELOIT CORPORATION ET AL.

UNION PACIFIC RAILROAD COMPANY, PETITIONER
08–1554          *v.*
REGAL-BELOIT CORPORATION ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 21, 2010]

JUSTICE KENNEDY delivered the opinion of the Court.

These cases concern through bills of lading covering cargo for the entire course of shipment, beginning in a foreign, overseas country and continuing to a final, inland destination in the United States. The voyage here included ocean transit followed by transfer to a rail carrier in this country. The Court addressed similar factual circumstances in *Norfolk Southern R. Co.* v. *James N. Kirby, Pty Ltd.*, 543 U. S. 14 (2004). In that case the terms of a through bill were controlled by federal maritime law and by a federal statute known as the Carriage of Goods by Sea Act (COGSA), note following 46 U. S. C. §30701. *Kirby* held that bill of lading provisions permissible under COGSA can be invoked by a domestic rail carrier, despite contrary state law.

The instant cases present a question neither raised nor addressed in *Kirby*. It is whether the terms of a through bill of lading issued abroad by an ocean carrier can apply to the domestic part of the import's journey by a rail carrier, despite prohibitions or limitations in another federal statute. That statute is known as the Carmack Amendment and it governs the terms of bills of lading issued by domestic rail carriers. 49 U. S. C. §11706(a).

I

Respondents Regal-Beloit Corporation, Victory Fireworks, Inc., PICC Property & Casualty Company Ltd., and Royal & Sun Alliance Insurance Company Ltd. are cargo owners or insurance firms that paid losses to cargo owners and succeeded to their rights, all referred to as "cargo owners." To ship their goods from China to inland destinations in the Midwestern United States, the cargo owners delivered the goods in China to petitioners in No. 08–1553, Kawasaki Kisen Kaisha, Ltd., and its agent "K" Line America, Inc., both referred to as "K" Line. All agree the relevant contract terms governing the shipment are contained in four through bills of lading "K" Line issued to the cargo owners. The bills of lading covered the entire course of shipment.

The bills required "K" Line to arrange delivery of the goods from China to their final destinations in the United States, by any mode of transportation of "K" Line's choosing. A bill of lading "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Kirby*, 543 U. S., at 18–19. A through bill of lading covers both the ocean and inland portions of the transport in a single document. *Id.,* at 25–26.

"K" Line's through bills contain five relevant provisions. First, they include a so-called "Himalaya Clause," which extends the bills' defenses and limitations on liability to

parties that sign subcontracts to perform services contemplated by the bills. See *id.,* at 20, and n. 2. Second, the bills permit "K" Line "to sub-contract on any terms whatsoever" for the completion of the journey. App. 145. Third, the bills provide that COGSA's terms govern the entire journey. Fourth, the bills require that any dispute will be governed by Japanese law. Fifth, the bills state that any action relating to the carriage must be brought in "Tokyo District Court in Japan." *Id.,* at 144. The forum-selection provision in the last clause gives rise to the dispute here.

"K" Line, pursuant to the bills of lading, arranged for the entire journey. It subcontracted with petitioner in No. 08–1554, Union Pacific Railroad Company, for rail shipment in the United States. The goods were to be shipped in a "K" Line vessel to a port in Long Beach, California, and then transferred to Union Pacific for rail carriage to the final destinations.

In March and April 2005, the cargo owners brought four different container shipments to "K" Line vessels in Chinese ports. All parties seem to assume that "K" Line safely transported the cargo across the Pacific Ocean to California. The containers were then loaded onto a Union Pacific train and that train, or some other train operated by Union Pacific, derailed in Tyrone, Oklahoma, allegedly destroying the cargo.

The cargo owners filed four separate lawsuits in the Superior Court of California, County of Los Angeles. The suit named "K" Line and Union Pacific as defendants. Union Pacific removed the suits to the United States District Court for the Central District of California. Union Pacific and "K" Line then moved to dismiss based on the parties' Tokyo forum-selection clause. The District Court granted the motion to dismiss. It decided that the forum-selection clause was reasonable and applied to Union Pacific pursuant to the Himalaya Clause in "K" Line's bills

of lading.  462 F. Supp. 2d 1098, 1102–1103 (2006).

The United States Court of Appeals for the Ninth Circuit reversed and remanded.  557 F. 3d 985 (2009).  The court concluded that the Carmack Amendment applied to the inland portion of an international shipment under a through bill of lading and thus trumped the parties' forum-selection clause.  *Id.,* at 994–995.  The court noted that this view was consistent with the position taken by the Court of Appeals for the Second Circuit, see *id.*, at 994 (citing *Sompo Japan Ins. Co. of Am.* v. *Union Pacific R. Co.*, 456 F. 3d 54 (2006)), but inconsistent with the views of the Courts of Appeals for the Fourth, Sixth, Seventh, and Eleventh Circuits, see 557 F. 3d, at 994 (citing *Shao* v. *Link Cargo (Taiwan) Ltd.*, 986 F. 2d 700 (CA4 1993); *American Road Serv. Co.* v. *Consolidated Rail Corp.*, 348 F. 3d 565 (CA6 2003); *Capitol Converting Equip., Inc.* v. *LEP Transp., Inc.*, 965 F. 2d 391 (CA7 1992); *Altadis USA, Inc. ex rel. Fireman's Fund Ins. Co.* v. *Sea Star Line, LLC*, 458 F. 3d 1288 (CA11 2006)).  This Court granted certiorari to address whether Carmack applies to the inland segment of an overseas import shipment under a through bill of lading.  558 U. S. ___ (2009).

## II

### A

Before turning to Carmack, a brief description of COGSA is in order; for "K" Line's and Union Pacific's primary contention is that COGSA, not Carmack, controls.  COGSA governs the terms of bills of lading issued by ocean carriers engaged in foreign trade.  49 Stat. 1207, as amended, note following 46 U. S. C. §30701, p. 1178.  It requires each carrier to issue to the cargo owner a bill that contains certain terms.  §3(3)–(8), at 1178–1179.  Although COGSA imposes some limitations on the parties' authority to adjust liability, it does not limit the parties' ability to adopt forum-selection clauses.  See *Vimar Seguros y*

*Reaseguros, S. A.* v. *M/V Sky Reefer*, 515 U. S. 528, 537–539 (1995). By its terms, COGSA only applies to shipments from United States ports to ports of foreign countries and vice versa. §§1(e), 13, at 1178, 1180. The statute, however, allows parties "the option of extending [certain COGSA terms] by contract" to cover "the entire period in which [the goods] would be under [a carrier's] responsibility, including [a] period of . . . inland transport." *Kirby*, 543 U. S., at 29 (citing COGSA §7, at 1180). Ocean carriers, who often must issue COGSA bills of lading, are regulated by the Federal Maritime Commission (Maritime Commission), which is responsible for oversight over "common carriage of goods by water in . . . foreign commerce." 46 U. S. C. §40101(1).

## B

The next statute to consider is the Carmack Amendment, §7, 34 Stat. 595, which governs the terms of bills of lading issued by domestic rail carriers. Carmack was first enacted in 1906 as an amendment to the Interstate Commerce Act, 24 Stat. 379. The Carmack Amendment has been altered and recodified over the last century. It now provides, in relevant part, as follows:

> "(a) A rail carrier providing transportation or service subject to the jurisdiction of the [Surface Transportation Board (STB)] under this part shall issue a receipt or bill of lading for property it receives for transportation under this part. That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the [STB] under this part are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this subsection is for the actual loss or injury to the property caused by—

> "(1) the receiving rail carrier;

"(2)  the delivering rail carrier; or

"(3) another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.

"Failure to issue a receipt or bill of lading does not affect the liability of a rail carrier."  49 U. S. C. §11706; see also §14706(a) (motor carriers).

The Carmack Amendment thus requires a rail carrier that "receives [property] for transportation under this part" to issue a bill of lading.  §11706(a).  The provision "this part" refers to is the STB's jurisdiction over rail transportation within the United States.  See §10501 (2006 ed. and Supp. II).  The STB is the successor to the Interstate Commerce Commission (ICC).  The STB has "exclusive" jurisdiction to regulate "transportation by rail carriers" between places in the United States as well as between a place "in the United States and a place in a foreign country."  §10501(a)(2)(F), (b) (2006 ed.).  Regulated rail carriers must provide transportation subject to STB rail carrier jurisdiction "on reasonable request," §11101(a), at reasonable rates,  §§10702, 10707(b), 11101(a), (e).

In cases where it applies, Carmack imposes upon "receiving rail carrier[s]" and "delivering rail carrier[s]" liability for damage caused during the rail route under the bill of lading, regardless of which carrier caused the damage.  §11706(a).  Carmack's purpose is to relieve cargo owners "of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods."  *Reider* v. *Thompson*, 339 U. S. 113, 119 (1950).  To help achieve this goal, Carmack constrains carriers' ability to limit liability by contract.  §11706(c).

Carmack also limits the parties' ability to choose the venue of their suit:

"(d)(1) A civil action under this section may be brought in a district court of the United States or in a State court.

"(2)(A) A civil action under this section may only be brought—

"(i) against the originating rail carrier, in the judicial district in which the point of origin is located;

"(ii) against the delivering rail carrier, in the judicial district in which the principal place of business of the person bringing the action is located if the delivering carrier operates a railroad or a route through such judicial district, or in the judicial district in which the point of destination is located; and

"(iii) against the carrier alleged to have caused the loss or damage, in the judicial district in which such loss or damage is alleged to have occurred." §11706.

For purposes of these cases, it can be assumed that if Carmack's terms apply to the bills of lading here, the cargo owners would have a substantial argument that the Tokyo forum-selection clause in the bills is pre-empted by Carmack's venue provisions. The parties argue about whether they may contract out of Carmack's venue provisions and other requirements, see §§10502, 10709; but in light of the disposition and ruling to follow, those matters need not be discussed or further explored.

## III

In *Kirby*, an ocean shipping company issued a through bill of lading, agreeing to deliver cargo from Australia to Alabama. Like the through bills in the present cases, the *Kirby* bill extended COGSA's terms to the inland segment under a Himalaya Clause. There, as here, the property

was damaged by a domestic rail carrier during the inland rail portion. 543 U. S., at 19–20.

*Kirby* held that the through bill's terms governed under federal maritime law, notwithstanding contrary state laws. *Id.,* at 23–27. *Kirby* explained that "so long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce." *Id.*, at 27. The Court added that "[a]pplying state law to cases like this one would undermine the uniformity of general maritime law." *Id.,* at 28. "Confusion and inefficiency will inevitably result if more than one body of law governs a given contract's meaning." *Id.,* at 29. The Court noted that its conclusion "reinforce[d] the liability regime Congress established in COGSA," and explained that COGSA allows parties to extend its terms to an inland portion of a journey under a through bill of lading. *Ibid.* Finally, the Court concluded that a contrary holding would defeat "the apparent purpose of COGSA, to facilitate efficient contracting in contracts for carriage by sea." *Ibid.*

Much of what the Court said in *Kirby* applies to the present cases. "K" Line issued the through bills under COGSA, in maritime commerce. Congress considered such international through bills and decided to permit parties to extend COGSA's terms to the inland domestic segment of the journey. The cargo owners and "K" Line did exactly that in these cases, agreeing in the through bills to require that any suit be brought in Tokyo.

## IV

The cargo owners argue that the Carmack Amendment, which has its own venue provisions and was not discussed in *Kirby*, requires a different result. In particular they argue that Carmack applies to the domestic inland segment of the carriage here, so the Tokyo forum-selection clause is inapplicable. For the reasons set forth below, this contention must be rejected. Instructed by the text,

history, and purposes of Carmack, the Court now holds that the amendment does not apply to a shipment originating overseas under a single through bill of lading. As in *Kirby*, the terms of the bill govern the parties' rights.

### A

The text of the statute charts the analytic course. Carmack divides the realm of rail carriers into three parts: (1) receiving rail carriers; (2) delivering rail carriers; and (3) connecting rail carriers. A "receiving rail carrier" is one that "provid[es] transportation or service . . . for property it receives for transportation under this part." §11706(a); see §11706(a)(1). The provision "this part" refers to is the STB's jurisdiction over rail transportation within the United States. See §10501. A "delivering rail carrier" "delivers the property and is providing transportation or service subject to the jurisdiction of the [STB] under this part." §11706(a); see §11706(a)(2). A connecting rail carrier is "another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading." §11706(a)(3).

A rail carrier's obligation to issue a Carmack-compliant bill of lading is determined by Carmack's first sentence:

> "A rail carrier providing transportation or service subject to the jurisdiction of the [STB] under this part shall issue a receipt or bill of lading for property it receives for transportation under this part." §11706(a).

This critical first sentence requires a Carmack-compliant bill of lading if two conditions are satisfied. First, the rail carrier must "provid[e] transportation or service subject to the jurisdiction of the [STB]." Second, that carrier must "receiv[e]" the property "for transportation under this part," where "this part" is the STB's jurisdiction over

domestic rail transport.  Carmack thus requires the receiving rail carrier—but not the delivering or connecting rail carrier—to issue a bill of lading.  As explained below, ascertaining the shipment's point of origin is critical to deciding whether the shipment includes a receiving rail carrier.

The conclusion that Carmack's bill of lading requirement only applies to the receiving rail carrier is dictated by the text and is consistent with this Court's precedent.  See *St. Louis, I. M. & S. R. Co.* v. *Starbird*, 243 U. S. 592, 604 (1917) (explaining that Carmack "requires the receiving carrier to issue a through bill of lading").  A receiving rail carrier is the initial carrier, which "receives" the property for domestic rail transportation at the journey's point of origin.  §11706(a).  If Carmack's bill of lading requirement did not refer to the initial carrier, but rather to any rail carrier that in the colloquial sense "received" the property from another carrier, then every carrier during the shipment would have to issue its own separate bill.  This would be altogether contrary to Carmack's purpose of making the receiving and delivering carriers liable under a single, initial bill of lading for damage caused by any carrier within a single course of shipment.

This Court's decision in *Mexican Light & Power Co.* v. *Texas Mexican R. Co.*, 331 U. S. 731 (1947), supports the conclusion that only the receiving rail carrier must issue a Carmack bill of lading.  There, a subsequent rail carrier in an export shipment from the United States to Mexico issued its own separate bill of lading at the U. S.-Mexico border.  The second bill differed from the through bill issued by the "initial carrier," *id.,* at 733, (that is, the receiving carrier) at the inland point of origin.  The Court held that Carmack, far from requiring nonreceiving carriers to issue their separate bills of lading, makes any subsequent bill "void" unless the "so-called second bill of lading represents the initiation of a new shipment."  *Id.,* at

734.

The Court's decision in *Reider* v. *Thompson*, 339 U. S. 113, is not to the contrary. That case involved goods originating in Argentina, bound for an inland location in the United States. The Court in *Reider* determined that because there was no through bill of lading, the original journey from Argentina terminated at the port of New Orleans. Thus, the first rail carrier in the United States was the receiving rail carrier and had to issue a Carmack bill of lading. *Id.,* at 117. And because that carrier had to issue a separate bill of lading, it was not liable for damage done during the ocean-based portion of the shipment. *Id.,* at 118–119. Notably, neither *Mexican Light* nor *Reider* addressed the situation in the present cases, where the shipment originates overseas under a through bill of lading. And, for this reason, neither case discussed COGSA.

The Carmack Amendment's second sentence establishes when Carmack liability applies:

> "[The receiving rail carrier referred to in the first sentence] and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the [STB] under this part are liable to the person entitled to recover under the receipt or bill of lading." §11706(a)

Thus, the receiving and delivering rail carriers are subject to liability only when damage is done to this "property," that is to say, to property for which Carmack's first sentence requires the receiving rail carrier to issue a bill of lading. *Ibid.* Put another way, Carmack applies only to transport of property for which Carmack requires a receiving carrier to issue a bill of lading, regardless of whether that carrier erroneously fails to issue such a bill. See *ibid.* ("Failure to issue a receipt or bill of lading does not affect the liability of a rail carrier"). The language in some of the Courts of Appeals' decisions, which were rejected by the

Court of Appeals in the opinion now under review, could be read to imply that Carmack applies only if a rail carrier actually issued a separate domestic bill of lading. See, *e.g., Atladis*, 458 F. 3d, at 1291–1294; *American Road*, 348 F. 3d, at 568; *Shao*, 986 F. 2d, at 703; *Capitol Converting*, 965 F. 2d, at 394. This may have led to some confusion. The decisive question is not whether the rail carrier in fact issued a Carmack bill but rather whether that carrier was required to issue a bill by Carmack's first sentence.

The above principles establish that for Carmack's provisions to apply the journey must begin with a receiving rail carrier, which would have to issue a Carmack-compliant bill of lading. It follows that Carmack does not apply if the property is received at an overseas location under a through bill that covers the transport into an inland location in the United States. In such a case, there is no receiving rail carrier that "receives" the property "for [domestic rail] transportation," §11706(a), and thus no carrier that must issue a Carmack-compliant bill of lading. The initial carrier in that instance receives the property at the shipment's point of origin for overseas multimodal import transport, not for domestic rail transport. (Today's decision need not address the instance where goods are received at a point in the United States for export. Nor is it necessary to decide if Carmack applies to goods initially received in Canada or Mexico, for import into the United States. See *infra*, at 16.)

The present cases illustrate the operation of these principles. Carmack did not require "K" Line to issue bills of lading because "K" Line was not a receiving rail carrier. "K" Line obtained the cargo in China for overseas transport across an ocean and then to inland destinations in the United States. "K" Line shipped this property under COGSA-authorized through bills of lading. See *supra*, at 4–5. That "K" Line chose to use rail transport to complete one segment of the journey under these "essentially mari-

time" contracts, *Kirby*, 543 U. S., at 24, does not put "K" Line within Carmack's reach and thus does not require it to issue Carmack bills of lading.

As for Union Pacific, it was also not a receiving rail carrier under Carmack. The cargo owners conceded at oral argument that, even under their theory, Union Pacific was a mere delivering carrier, which did not have to issue its own Carmack bill of lading. See Tr. of Oral Arg. 29, 39. This was a necessary concession. A carrier does not become a receiving carrier simply by accepting goods for further transport from another carrier in the middle of an international shipment under a through bill. After all, Union Pacific was not the "initial carrier" for the carriage. *Mexican Light*, 331 U. S., at 733.

If a carrier like Union Pacific, which acts as a connecting or delivering carrier during an international through shipment, was, counterintuitively, a receiving carrier under Carmack, this would in effect outlaw through shipments under a single bill of lading. This is because a carriage like the one in the present case would require two bills of lading: one that the overseas carrier (here, "K" Line) issues to the cargo owners under COGSA, and a second one that the first domestic rail carrier (here, Union Pacific) issues to the overseas carrier under Carmack. *Kirby* noted "the popularity of 'through' bills of lading, in which cargo owners can contract for transportation across oceans and to inland destinations in a single transaction." 543 U. S., at 25–26. The Court sees no reason to read COGSA and Carmack to outlaw this efficient mode of international shipping by requiring these journeys to have multiple bills of lading. In addition, if Union Pacific had to issue a Carmack bill of lading to "K" Line, it is unclear whether the cargo owners (the parties Carmack is designed to protect) would be able to sue under the terms governing that bill, especially in light of their different through bill with "K" Line. These difficulties are reason

enough to reject this novel interpretation of Carmack, which was neither urged by any party nor adopted by any authority that has been called to this Court's attention.

This would be a quite different case if, as in *Reider*, the bills of lading for the overseas transport ended at this country's ports and the cargo owners then contracted with Union Pacific to complete a new journey to an inland destination in the United States. Under those circumstances, Union Pacific would have been the receiving rail carrier and would have been required to issue a separate Carmack-compliant bill of lading to the cargo owners. See *Reider*, 339 U. S., at 117 ("If the various parties dealing with this shipment separated the carriage into distinct portions by their contracts, it is not for courts judicially to meld the portions into something they are not").

The Court of Appeals interpreted Carmack as applying to any domestic rail segment of an overseas shipment, regardless of whether Carmack required a bill of lading. The court rested on the assumption that "[STB]'s jurisdiction . . . is coextensive with Carmack's coverage." 557 F. 3d, at 992. Yet, as explained above, Carmack applies only to shipments for which Carmack requires a bill of lading; that is to say, to shipments that start with a carrier that is both subject to the STB's jurisdiction and "receives [the property] for [domestic rail] transportation." The Court of Appeals ignored this "receive[d] . . . for transportation" limitation and so reached the wrong conclusion. See, *e.g., Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 339 (1979) (courts are "obliged to give effect, if possible, to every word Congress used").

The Court of Appeals' conclusion is also an awkward fit with Carmack's venue provisions. Under Carmack, a suit against the "originating" (that is, receiving) rail carrier that has not actually caused the damage to the goods "may only be brought . . . in the judicial district in which the point of origin is located." §11706(d)(2)(A), (A)(i). Suit

against either a delivering carrier or any carrier that caused the damage, by contrast, may be brought in various other districts. See §11706(d)(2)(B), (C). "[J]udicial district" refers to "district court of the United States or in a State Court." §11706(d)(1). Carmack's venue provisions presume that the receiving carrier obtains the property in a judicial district within the United States. Here, the journey's "point of origin" was China, so Carmack's venue provisions reinforce the interpretation that Carmack does not apply to this carriage.

Indeed, if "K" Line were a receiving carrier in a case where the journey's "point of origin" was China, there would be no place under Carmack to sue "K" Line, since China is not within a judicial district "of the United States or in a State court." *Ibid.* Carmack's original premise is that the receiving carrier is liable for damage caused by the other carriers in the delivery chain. This premise would be defeated if there were no venue in which to sue the receiving rail carrier, as opposed to suing a different carrier under one of Carmack's other venue provisions and then naming the receiving carrier as a codefendant. The far more likely conclusion is that "K" Line is not a receiving rail carrier at all under Carmack, and thus Carmack, including its venue provisions, does not apply to property shipped under "K" Line's through bills. True, if the sole question were one of venue, suit could still be brought against the carrier that caused the damage or the delivering carrier. But the issue need not be explored here, for, as the Court holds, Carmack is inapplicable in these cases.

## B

Carmack's statutory history supports the conclusion that it does not apply to a shipment originating overseas under a through bill. None of Carmack's legislative versions have applied to the inland domestic rail segment of an import shipment from overseas under a through bill.

Congress enacted Carmack in 1906, as an amendment to the Interstate Commerce Act. At that time, the amendment's provisions applied only to "property for transportation from a point in one State to a point in another State." §7, 34 Stat. 595. Congress amended Carmack in 1915, §1, 38 Stat. 1197, and the relevant language remained unchanged until Carmack was recodified in 1978. Under the pre-1978 language, Carmack's bill of lading provisions applied not only to wholly domestic rail transport but also to cargo "receive[d] . . . for transportation" "from any point in the United States to a point in an adjacent foreign country." 49 U. S. C. §20(11) (1976 ed.).

Even if there could be some argument that the Carmack Amendment before 1978 applied to imports from Canada and Mexico because the phrase "from . . . to" could also mean "between," cf. *Reider, supra,* at 118 (explicitly not deciding this issue), the Court is unaware of any authority holding that the Carmack Amendment before 1978 applied to cargo originating from nonadjacent overseas countries under a through bill. See, *e.g., In re The Cummins Amendment,* 33 I. C. C. 682, 693 (1915); Brief for Respondents 8 (effectively conceding this point).

In 1978, Congress adopted the Carmack Amendment in largely its current form. §1, 92 Stat. 1337. Congress in the statute itself stated that it was recodifying Carmack and instructed that this recodification "may not be construed as making a substantive change in the la[w]." §3(a), *id.,* at 1466; see *Burlington Northern R. Co.* v. *Oklahoma Tax Comm'n,* 481 U. S. 454, 457, n. 1 (1987). By interpreting the current version of the Carmack Amendment to cover cargo originating overseas, the Court of Appeals disregarded this direction and dramatically expanded Carmack's scope beyond its historical coverage.

Finally, in 1995, Congress reenacted Carmack. But that reenactment evidenced no intent to affect the substantive change that Court of Appeals' decision would entail. See

§102(a), 109 Stat. 847–849. There is no claim that the 1995 statute altered Carmack's text in any manner relevant here, as that reenactment merely indented subsections of Carmack for readability. Cf. *United States* v. *O'Brien*, 560 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 14) ("[C]urrent legislative drafting guidelines . . . advise drafters to break lengthy statutory provisions into separate subsections that can be read more easily").

C

Where the text permits, congressional enactments should be construed to be consistent with one another. And the interpretation of Carmack the Court now adopts attains the most consistency between Carmack and COGSA. First, applying Carmack to the inland segment of an international carriage originating overseas under a through bill would undermine Carmack's purposes. Carmack is premised on the view that the shipment has a single bill of lading and any damage during the journey is the responsibility of both the receiving and the delivering carrier. See *supra*, at 6. Yet, under the Court of Appeals' interpretation of Carmack, there would often be no venue in which to sue the receiving carrier. See *supra*, at 14–15.

Applying two different bill of lading regimes to the same through shipment would undermine COGSA and international, container-based multimodal transport. As *Kirby* explained, "[t]he international transportation industry 'clearly has moved into a new era—the age of multimodalism, door-to-door transport based on efficient use of all available modes of transportation by air, water, and land.'" 543 U. S., at 25 (quoting 1 T. Schoenbaum, Admiralty and Maritime Law 589 (4th ed. 2004)). If Carmack applied to an inland segment of a shipment from overseas under a through bill, then one set of liability and venue rules would apply when cargo is damaged at sea (COGSA) and another almost always would apply when the damage

occurs on land (Carmack).  Rather than making claims by cargo owners easier to resolve, a court would have to decide where the damage occurred to determine which law applied.  As a practical matter, this requirement often could not be met; for damage to the content of containers can occur when the contents are damaged by rough handling, seepage, or theft, at some unknown point.  See H. Kindred & M. Brooks, Multimodal Transport Rules 143 (1997).  Indeed, adopting the Court of Appeals' approach would seem to require rail carriers to open containers at the port to check if damage has been done during the sea voyage.  This disruption would undermine international container-based transport.  The Court will not read Congress' nonsubstantive recodification of Carmack in 1978 to create such a drastic sea change in practice in this area.

Applying Carmack's provisions to international import shipping transport would also undermine the "purpose of COGSA, to facilitate efficient contracting in contracts for carriage by sea." *Kirby, supra,* at 29.  These cases provide an apt illustration.  The sophisticated cargo owners here agreed to maritime bills of lading that applied to the inland segment through the Himalaya Clause and authorized "K" Line to subcontract for that inland segment "on any terms whatsoever."  The cargo owners thus made the decision to select "K" Line as a single company for their through transportation needs, rather than contracting for rail services themselves.  The through bills provided the liability and venue rules for the foreseeable event that the cargo was damaged during carriage.  Indeed, the cargo owners obtained separate insurance to protect against any excess loss.  The forum-selection clause the parties agreed upon is "an indispensable element in international trade, commerce, and contracting" because it allows parties to "agre[e] in advance on a forum acceptable" to them.  *The Bremen* v. *Zapata Off-Shore Co.*, 407 U. S. 1, 13–14 (1972).  A clause of this kind is enforced unless it imposes a venue

"so gravely difficult and inconvenient that [the plaintiff] will for all practical purposes be deprived of his day in court." *Id.,* at 18. The parties sensibly agreed that because their bills were governed by Japanese law, Tokyo would be the best venue for any suit relating to the cargo.

The cargo owners' contrary policy arguments are unavailing. They assert that if Carmack does not apply, the inland segment of international shipments will be "unregulated." Brief for Respondents 2, 21, 24, 64, 91. First, any speculation that not applying Carmack to inland segments of overseas shipments will cause severe problems is refuted by that fact that Carmack even arguably did not govern the inland portion of such shipments from its enactment in 1906 until its nonsubstantive recodification in 1978. See *supra*, at 15–17. It is true that if the cargo owners' position were to prevail, the terms of through bills of lading made in maritime commerce would be more restricted in some circumstances. But that does not mean that the Court's holding leaves the field unregulated. Ocean-based through bills are governed by COGSA, and ocean vessels like those operated by "K" Line are overseen by the Federal Maritime Commission. *Supra,* at 4–5. Rail carriers like Union Pacific, furthermore, remain subject to the STB's regulation to the extent they operate within the United States. See *supra*, at 13–14. It is notable that although the STB has jurisdiction to regulate the rates of such carriers, even when the carriage is not governed by the Carmack Amendment, STB has exercised its authority to exempt from certain regulations service provided by a rail carrier "as part of a continuous intermodal freight movement," 49 CFR §1090.2 (2009), like the journey at issue in these cases, see *ibid.* (exercising STB's deregulation authority under 49 U. S. C. §10502(f)).

Finally, the cargo owners miss the mark in relying on the recent United Nations Convention on Contracts for the International Carriage of Goods Wholly or Partly by Sea,

which has yet to be "ratified by the President with the advice and consent of the Senate." Brief for United States as *Amicus Curiae* 11. These so-called "Rotterdam Rules" would explicitly allow the inland leg of an international shipment to be governed by a different legal regime than the ocean leg, under some circumstances. See G. A. Res. 63/122, art. 26, U. N. Doc. A/RES/63/122 (Dec. 11, 2008). Nothing in the Rotterdam Rules, however, requires every country to mandate a different regime to govern the inland rail leg of an international through shipment; and, as explained above, Congress, by enacting COGSA, has opted for allowing shipments governed by a single through bill. And if the objection is that today's decision will undermine the results of these international negotiations in some way, that concern is met by the fact that the United States Government has urged the result the Court adopts today. See Brief for United States as *Amicus Curiae* 13–29.

Congress has decided to allow parties engaged in international maritime commerce to structure their contracts, to a large extent, as they see fit. It has not imposed Carmack's regime, textually and historically limited to the carriage of goods received for domestic rail transport, onto what are "essentially maritime" contracts. *Kirby*, 543 U. S., at 24.

## V

"K" Line received the goods in China, under through bills for shipment into the United States. "K" Line was thus not a receiving rail carrier under Carmack and was not required to issue bills of lading under that Amendment. Union Pacific is also not a receiving carrier for this carriage and was thus not required to issue Carmack-compliant bills. Because the journey included no receiving rail carrier that had to issue bills of lading under Carmack, Carmack does not apply. The parties' agreement to litigate these cases in Tokyo is binding. The cargo owners

must abide by the contracts they made.

\*    \*    \*

The judgment of the Court of Appeals for the Ninth Circuit is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

Nos. 08–1553 and 08–1554

---

KAWASAKI KISEN KAISHA LTD., ET AL.,
PETITIONERS
08–1553                    *v.*
REGAL-BELOIT CORPORATION ET AL.


UNION PACIFIC RAILROAD COMPANY, PETITIONER
08–1554                    *v.*
REGAL-BELOIT CORPORATION ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 21, 2010]

JUSTICE SOTOMAYOR, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, dissenting.

In my view, the Carmack Amendment to the Interstate Commerce Act (ICA), §7, 34 Stat. 595, plainly applies to the inland leg of a multimodal shipment traveling on an international through bill of lading. Unless they have permissibly contracted around Carmack's requirements, rail carriers in the United States such as petitioner Union Pacific are subject to those requirements, even though ocean carriers such as petitioner "K" Line are not. To avoid this simple conclusion, the Court contorts the statute and our cases, misreads the statutory history, and ascribes to Congress a series of policy choices that Congress manifestly did not make. Because I believe Carmack provides the default legal regime for rail transportation of cargo within the United States, regardless of whether the shipment originated abroad, I would reach the second question presented: whether Union Pacific was free to opt

out of Carmack under 49 U. S. C. §10709, or whether Union Pacific first had to offer "K" Line, its contractual counterparty, Carmack-compliant terms under §10502. As to that question, I would hold that opt-out under §10709 was not available and would remand to the District Court to consider in the first instance whether Union Pacific satisfied its obligations under §10502. For these reasons, I respectfully dissent.

I

The Court's interpretation of Carmack's scope is wrong as a matter of text, history, and policy.

A

1

I begin with the statute's text. Two provisions guide my conclusion that Carmack provides the default legal regime for the inland leg of a multimodal shipment traveling on an international through bill of lading: §11706(a), which outlines the basic requirements for liability under Carmack, and §10501(a), which defines the jurisdiction of the Surface Transportation Board (STB or Board), the successor to the Interstate Commerce Commission (ICC), see *ante*, at 7. Section 11706(a) states as follows:

"A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall issue a receipt or bill of lading for property it receives for transportation under this part. That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Board under this part are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this subsection is for the actual loss or injury to the property caused by—

"(1) the receiving rail carrier;

"(2) the delivering rail carrier; or

"(3) another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.

"Failure to issue a receipt or bill of lading does not affect the liability of a rail carrier. A delivering rail carrier is deemed to be the rail carrier performing the line-haul transportation nearest the destination but does not include a rail carrier providing only a switching service at the destination."

With respect to the Board's jurisdiction, §10501(a) provides as follows:

"(1) Subject to this chapter, the Board has jurisdiction over transportation by rail carrier that is—

"(A) only by railroad; or

"(B) by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment.

"(2) Jurisdiction under paragraph (1) applies only to transportation in the United States between a place in—

"(A) a State and a place in the same or another State as part of the interstate rail network;

. . . . .

"(E) the United States and another place in the United States through a foreign country; or

"(F) the United States and a place in a foreign country."

"A simple, straight-forward reading of [these provisions] practically compels the conclusion that the Carmack Amendment applies in a typical multimodal carriage case with inland damage." Sturley, Maritime Cases About Train Wrecks: Applying Maritime Law to the Inland

Damage of Ocean Cargo, 40 J. Mar. L. & Com. 1, 13 (2009) (hereinafter Train Wrecks). The first sentence of §11706(a) sets forth the circumstances in which a receiving rail carrier must issue a bill of lading: when property is first "receive[d]" for domestic transportation. This sentence does not define the full scope of Carmack liability, however, as the penultimate sentence of §11706(a) makes the absence of a bill of lading ultimately immaterial to the question of Carmack liability. Instead, the second sentence of §11706(a) establishes Carmack's expansive scope, explaining which carriers are subject to Carmack liability: not only the rail carrier that receives the property, but also "any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Board under this part." Critically, that a rail carrier's provision of "transportation or service subject to the jurisdiction of the Board" is the criterion that establishes liability under Carmack demonstrates that Carmack's scope must be considered in tandem with the provision describing the Board's jurisdiction over rail carriage.

Under that provision, the Board has authority "over transportation by rail carrier," either when that transportation is "only by railroad" or when it is "by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment." §10501(a)(1). Board jurisdiction over transportation by rail carrier "applies only to transportation in the United States," not to transportation abroad. §10501(a)(2). Within the United States, however, Board jurisdiction exists broadly whenever that transportation is "between," *inter alia*, "a place in . . . a State and a place in the same or another State as part of the interstate rail network," "a place in . . . the United States and another place in the United States through a foreign country," or "a place in . . . the United States and a place in a foreign

country."  §§10501(a)(2)(A), (E), (F).

With the jurisdictional framework in mind, I return to the final sentences of Carmack, §11706. The third sentence clarifies that liability under Carmack is imposed upon (1) "the receiving rail carrier" (which, under the first sentence of §11706(a) and the definition of the Board's jurisdiction over domestic rail carriage in §10501(a), is the rail carrier that first receives the property for transportation in the United States); (2) "the delivering rail carrier" (which, under the last sentence of §11706(a) and the Board's jurisdiction over domestic rail carriage in §10501(a), is the final rail carrier providing the long-distance transportation "nearest the destination" in the United States); and (3) "another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading."  §11706(a). This last phrase in §11706(a)(3) serves two functions. It ensures that, where the entire rail transportation is "[with]in the United States," any connecting rail carrier between the point at which the goods were received and the point at which the goods were delivered is liable under Carmack. It also ensures that, where the final destination of the goods is in Canada or Mexico, such that there is no domestic "delivering" carrier, a connecting carrier taking on the goods in the United States will remain subject to Carmack as it travels toward its foreign destination while still in the United States.  (As noted, the jurisdictional provision, incorporated by reference in §11706(a), is limited to "transportation in the United States," §10501(a)(2).)

The language of Carmack thus announces an expansive intent to provide the liability regime for rail carriage of property within the United States. Once a first domestic rail carrier subject to the Board's jurisdiction receives property in the United States, Carmack attaches, regard-

less of where the property originated. Carmack then applies to any other rail carrier subject to the Board's jurisdiction in the chain of transportation, no matter whether the ultimate destination of the property is in the United States or elsewhere, for the period the carrier is traveling within the United States.

It seems to me plain that, under these broadly inclusive provisions, Carmack governs rail carriers such as Union Pacific for any transportation of cargo within the United States, whether or not their domestic transportation is part of a multimodal international shipment, and whether or not they actually issued a domestic bill of lading. There is no question that Union Pacific is a "rail carrier" that is "subject to the jurisdiction of the Board." §11706(a). It "receive[d]" the cargo, *ibid.*, in California for domestic transportation to four different domestic inland locations—*i.e.*, "between a place in . . . a State and a place in . . . another State," §10501(a)(2)(A)—while the shipment itself was transported "between a place in . . . the United States and a place in a foreign country," §10501(a)(2)(F). Union Pacific should have issued a bill of lading for the cargo it received, but its failure to do so does not shield it from liability, as §11706(a) makes clear. Carmack therefore provides the legal regime governing Union Pacific's rail transportation in these cases.

Carmack does not, however, govern ocean carriers such as "K" Line, because such carriers are not "rail carrier[s] providing transportation or service subject to the jurisdiction of the Board." §11706(a). The ICA defines a "rail carrier" as "a person providing common carrier railroad transportation for compensation." §10102(5). To resolve whether "K" Line meets this definition, I would apply the STB's well established test and ask whether it "conduct[s] rail operations" and "'hold[s] out' that service to the public." *Assoc. of P&C Dock Longshoremen* v. *Pittsburgh and Conneaut Dock Co.*, 8 I. C. C. 2d 280, 290 (1992).

Respondents—the owners of cargo that was allegedly damaged during Union Pacific's train derailment in Oklahoma, *ante*, at 2–3—primarily contend that "K" Line conducted rail operations by using containers to transport the cargo from China to the United States in conjunction with Union Pacific's subsequent carriage of those same containers. Brief for Respondents 82–83 (noting that the statutory definition of "railroad" includes "'intermodal equipment used by or in connection with a railroad,'" §10102(6)(A)). This interpretation goes too far. Read so literally, the statute would render a truck a railroad simply because the truck transported containers during a journey in which the containers also traveled by rail. Such a reading would gut the separate provisions of the ICA governing motor carriage in subtitle IV, part B of Title 49. The ICA's broad description of what the term "railroad" "includes," §10102(6), is better read as ensuring that all services a rail carrier conducts are regulated under the Act "to prevent overcharges and discriminations from being made under the pretext of performing such additional services." *Cleveland, C., C. & St. L. R. Co.* v. *Dettlebach*, 239 U. S. 588, 594 (1916).

At oral argument, respondents focused on a separate argument, contending that "K" Line should be considered a rail carrier because it conducts substantial rail operations at its depot facility in Long Beach, California. Tr. of Oral Arg. 37 (describing transportation between Port of Los Angeles, where "K" Line's private chassis transport the containers on the Port's train tracks to the Los Angeles train depot, where the containers are loaded onto Union Pacific trains for inland transportation). I agree with the Board, however, that "'ownership and operation of private terminal facilities, including rail yards,'" is not sufficient to bring a shipper within the definition of "'a rail carrier subject to [Board] jurisdiction'" where the "'terminal is maintained for [the ocean common carrier's] exclu-

sive use in interchanging cargo with rail and motor carriers providing inland transportation.'" *Joint Application of CSX Corp. & Sea-Land Corp. Under 49 U. S. C. §11321*, 3 I. C. C. 2d 512, 519 (1987).[1]

The jurisdictional provisions of the ICA and the Shipping Act of 1984, 46 U. S. C. §40101 *et seq.*, confirm my view that "K" Line is not a rail carrier "subject to the jurisdiction of the Board," 49 U. S. C. §11706(a), under Carmack. The STB's jurisdiction over transportation by rail carriers is "exclusive," §10501(b), while ocean carriers are subject to the jurisdiction of the Federal Maritime Commission (FMC), 46 U. S. C. §40102; see also 46 CFR §520.1 (2009). In addition, the Board's jurisdiction over water carriage is limited to domestic water carriage. 49 U. S. C. §13521(a)(3). The Board itself has concluded that ocean carriers providing intermodal transportation jointly with inland rail and motor carriers are subject to the FMC's jurisdiction rather than its own. See *Improvement of TOFC/COFC Regulations*, 3 I. C. C. 2d 869, 883 (1987).

For these reasons, Carmack governs Union Pacific but not "K" Line for the inland transportation at issue in these cases.

### 2

In finding Carmack inapplicable to the inland transportation in these cases, the majority relies on the fact that Carmack does not govern ocean carriers such as "K" Line. While I agree that "K" Line is not a rail carrier, the majority places too much weight on that determination. That the ocean carrier "K" Line is not subject to Carmack does not affect the determination that the rail carrier Union Pacific is, for the textual reasons I have explained. The

---

[1] Because I do not think that "K" Line conducts rail operations at all, I would not reach the question whether "K" Line holds itself out as offering rail common carriage. Compare Brief for Respondents 84–85, with Reply Brief for Petitioners in No. 08–1553, pp. 7–10.

majority's contrary reading of the statute reflects four fundamental errors.

First, the majority reads the term "receiving rail carrier" in §11706(a) too narrowly. There is simply no basis in the text of the statute to support the majority's conclusion that Carmack applies only when the first rail carrier in the chain of transportation accepted the cargo at the shipment's point of origin. Cf. *ante*, at 10, 12. The two cases the majority cites for this proposition are inapposite, as neither addresses an international, multimodal shipment in which the first leg of the trip was by ocean.[2] In *St. Louis, I. M. & S. R. Co.* v. *Starbird*, 243 U. S. 592, 594 (1917), the entire shipment was by rail from Arkansas to New York City. And in *Mexican Light & Power Co.* v. *Texas Mexican R. Co.*, 331 U. S. 731, 732 (1947), the entire shipment was by rail from Pennsylvania to Mexico. Given that the first rail carrier was in each case the carrier that received the goods from the shipper and issued a through bill of lading, it is unsurprising that the Court, applying Carmack, described that carrier as the "initial carrier." 243 U. S., at 595; 331 U. S., at 733. But nothing in these cases, and nothing in Carmack itself, requires that the "receiving carrier" take the goods from the shipper at the shipment's point of origin.[3]

Instead, these cases are compatible with my view that the "receiving carrier" is any rail carrier that first receives cargo for transportation in the United States. Union

─────────

[2] The additional cases the United States cites for this proposition suffer from this same flaw. See Brief for United States as *Amicus Curiae* 27–28; Tr. of Oral Arg. 20.

[3] Carmack's venue provision refers to the "receiving rail carrier" as the "originating rail carrier" and states that the proper venue for a lawsuit against this carrier is "the judicial district in which the point of origin is located." §11706(d)(2)(A)(i). Especially because the focus of Carmack is on transportation by rail, the phrase "point of origin" in this context is best read as referring to the point of origin of the "originating rail carrier['s]" transportation, not the point of origin of the shipment.

Pacific, which is unquestionably a "rail carrier" in the normal sense of those words, is also the "receiving carrier" subject to liability under Carmack.[4] Our opinion in *Reider* v. *Thompson*, 339 U. S. 113 (1950), further supports this reading. There we explained that the test for Carmack applicability "is not where the shipment originated, but where the obligation of the carrier as receiving carrier originated." *Id.,* at 117. Because Carmack applies to domestic rail transport, and the domestic rail carrier's obligation in that case arose in New Orleans where the rail carrier received the goods, it did not matter that the shipment began overseas in Buenos Aires. Similarly, in the instant cases, because Union Pacific's obligations to transport by rail originated in California, it does not matter that the shipment began overseas in China.[5]

Second, the majority errs in suggesting that the issuance of an international through bill of lading precludes the applicability of Carmack. Cf. *ante*, at 10–11, 13. The

---

[4] The majority suggests that respondents "conceded" at oral argument that Union Pacific was not a receiving carrier but only a delivering carrier. *Ante*, at 13. Of course, this Court is not bound by a party's concession in our interpretation of a statute. See, *e.g., Massachusetts* v. *United States*, 333 U. S. 611, 624–625 (1948).

[5] Contrary to Union Pacific's suggestion, Brief for Petitioner in 08–1554, p. 33, its obligations did not originate in China. "K" Line's bills of lading, issued in China, "entitled ["K" Line] to sub-contract on any terms . . . all duties whatsoever undertaken," App. 145, and therefore did not create any obligation on the part of Union Pacific in China. In turn, the agreement between "K" Line and Union Pacific—which "K" Line made "by and through its duly authorized agent and representative in the United States, 'K' Line AMERICA, Inc. . . ., a Michigan corporation," *id.,* at 120—was a multiyear contract committing "K" Line to "tender to [Union Pacific] not less than 95% of its Container traffic," *ibid.*, but did not actually commit "K" Line to deliver any particular piece of cargo to Union Pacific. As "K" Line explains, then, "the Agreement [with Union Pacific] was a 'requirements' contract, which did not become effective as to any particular container until 'K' Line delivered it" to Union Pacific in California. Brief for Petitioners in No. 08–1553, p. 12.

cases on which the majority relies do not stand for this proposition. In *Reider*, the Court found Carmack applicable when the first domestic rail carrier issued a bill of lading from New Orleans to Boston. Although we observed in that opinion that there was no through bill of lading from Buenos Aires to Boston, 339 U. S*.,* at 117, we did not say, and it is not a necessary corollary, that the presence of such a bill of lading would have commanded a different result. The observation is better read as indicating that no law other than Carmack could possibly have applied in that case: Because "the shipment . . . could not have moved an inch beyond New Orleans under the ocean bill," *id.,* at 118, a new domestic bill of lading for domestic transportation was required, and as to that transportation, we held, Carmack unquestionably applied.

For its part, *Mexican Light* held only that, where the first rail carrier in the chain of transportation issued a bill of lading, a subsequent bill of lading issued by a later rail carrier was void because Carmack contemplates one through bill of lading governing the entire journey by rail. 331 U. S., at 734. A subsequent bill of lading by a connecting rail carrier, however, can be void under Carmack without requiring the conclusion that an international through bill of lading involving initial transportation by ocean carrier would void a subsequent bill of lading issued in the United States by the first rail carrier in the domestic chain of transportation. Because the text of Carmack expressly requires a bill of lading to be issued for property "receive[d] for transportation under this part," and Union Pacific first received the property for rail transportation in the United States, it should have issued a bill of lading. Of course, its failure to do so did not affect its liability under Carmack (or that of a subsequent connecting or delivering carrier), as §11706(a) explicitly states.

Third, the majority errs in giving weight to the difference in scope between Carmack liability and the jurisdic-

tion of the Board. *Ante*, at 14. I agree with the majority that Carmack's reach is narrower than the Board's jurisdiction. The Board's jurisdiction extends over transportation by rail carrier "in the United States between a place in . . . the United States and a place in a foreign country," §10501(a)(2)(F), which indicates that it does not matter whether the movement of the transportation is from the United States to the foreign country or from the foreign country to the United States.[6] In contrast, Carmack applies only when a rail carrier first receives property in the United States, §11706(a), and therefore would not apply to a rail carrier originating in Canada and delivering in the United States without transferring the property to a domestic rail carrier.[7] As long as there is a receiving rail carrier in the United States, however, Carmack attaches. Because the property at issue in these cases was received in the United States for domestic transportation by Union Pacific, Carmack governs the rail carrier's liability.

Finally, the majority misunderstands the role I believe Carmack liability plays in international shipments to the United States. My reading of the statute would not "outlaw through shipments under a single bill of lading."

———————

[6] The ICA's jurisdictional provision uses the term "foreign country" to describe the Board's jurisdiction, §10501(a)(2)(F), while Carmack uses the term "adjacent foreign country" to describe the liability of connecting carriers, §11706(a)(3). I find the difference between these terms to be of no moment. Section 10501 describes the Board's jurisdiction over rail carriers, and it is impossible to have connecting rail lines between the United States and a foreign country that is not adjacent. This reading is confirmed by §10501(a)(2)(E), which refers to the Board's jurisdiction over transportation by railroad "in the United States between a place in . . . the United States and another place in the United States and a foreign country." No rail transportation between two places in the United States that is interrupted by rail transportation through a foreign country could be through a foreign country that is anything but adjacent.

[7] This situation is consistent with historical agreements between the ICC and its Canadian counterpart. See *infra*, at 14–15.

*Ante*, at 13. To the contrary, an overseas ocean carrier like "K" Line can still issue a through bill of lading governing the entire international trip to an American destination. That bill of lading reflects the ocean carrier's agreement with and obligations to the original shipper of the cargo. As the ocean carrier has no independent Carmack obligations of its own, the ocean carrier and the shipper are free to select whatever liability terms they wish to govern their relationship during the entire shipment. See *infra*, at 20–21. Carmack simply requires an American "receiving rail carrier" like Union Pacific to issue a bill of lading to the party from whom it received the goods for shipment—here, "K" Line. See *Norfolk Southern R. Co.* v. *James N. Kirby, Pty Ltd.*, 543 U. S. 14, 33 (2004) ("When an intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed"); *Great Northern R. Co.* v. *O'Connor*, 232 U. S. 508, 514–515 (1914) (holding that a railroad company is entitled to treat the intermediary forwarder as the shipper). As to that bill of lading, Carmack provides the legal regime and defines the relationship between the contracting parties (unless they have agreed to contract out of Carmack, see *infra*, at 23–26). The issuance of this second bill of lading, however, in no way undermines the efficiency of the through bill of lading between the ocean carrier and the original shipper, nor does it require that those parties bind themselves to apply Carmack to the inland leg.[8]

———————

[8] The majority seems to find it troubling that my view "would require two bills of lading." *Ante*, at 13. But international shipments frequently contain more than one bill of lading. See, *e.g., Kirby*, 543 U. S., at 30–33 (interpreting the parties' obligations under two bills of lading, one between a shipper and a freight forwarding company to which the shipper originally delivered its goods, and one between the freight forwarding company and the ocean carrier to which the freight for-

B

In addition to misreading the text, the Court's opinion misapplies Carmack's statutory history. The Court states that no version of Carmack has ever applied to imports originating overseas on a through bill of lading. *Ante*, at 15. The Court further asserts that, because Congress stated that the 1978 recodification of the ICA effected no "substantive change," Carmack should be read consistently with this historical practice. *Ante*, at 16. There are three problems with this analysis.

First, if "Congress intended no substantive change" to Carmack in the 1978 recodification, "that would mean only that the present text is the best evidence of what the law has always meant, and that the language of the prior version cannot be relied upon to support a different reading." *Keene Corp.* v. *United States*, 508 U. S. 200, 221 (1993) (STEVENS, J., dissenting). Because the present text of Carmack indicates that it applies to the domestic inland rail transportation of a multimodal international shipment, there is no reason to rely on Congress' statement in the recodification.

Second, there is no necessary conflict between the pre-

_____

warder delivered the shipper's goods). The majority also suggests that an original shipper might not be able to sue Union Pacific under the terms of Union Pacific's bill with "K" Line. *Ante*, at 13. In *Kirby*, however, we took as a given that the shipper could sue the inland rail carrier, even though the shipper was not a party to the rail carrier's bill of lading with an intermediary. Indeed, we held that in an action against the rail carrier, the shipper was bound to the terms of the bill of lading governing the rail carrier's transportation, even though those terms were less generous than the terms in the shipper's through bill of lading with the freight forwarder with which it originally contracted. 543 U. S., at 33–34. We observed that the shipper could sue the freight forwarder to recover the difference. *Id.,* at 35. In light of this analysis, I see no reason to doubt a shipper's ability to sue an American rail carrier under Carmack, even though its bill of lading with an overseas ocean carrier is not governed by Carmack.

1978 version of Carmack and my reading of the current text. The pre-1978 text referred to a carrier "receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, [or the] District of Columbia, or from any point in the United States to a point in an adjacent foreign country." 49 U. S. C. §20(11) (1976).[9] A rail carrier like Union Pacific who receives property in California for transportation to locations in the American midwest "receiv[es] property from a point in one State . . . to a point in another State," regardless of whether the property originated in California or China. The geographical restriction "from any point in the United States to a point in an adjacent foreign country" simply reflected agreements between the ICC and its Canadian counterpart to respect each other's regulation of rail carriage originating in that country. See Brief for United States as *Amicus Curiae* (hereinafter Brief for United States) 17–18. It does not indicate any rejection of Carmack's applicability to imports as a whole or exports to a nonadjacent foreign country.[10] In-

－－－－－－－－－－

[9] The pre-1978 version of Carmack referred generally to a "carrier," rather than a "rail carrier." It was not until 1995 that Congress distinguished between Carmack's applicability to rail carriers, §11706, and motor carriers, freight forwarders, and domestic water carriers, §14706. Pub. L. No. 104–88, §102(a), 109 Stat. 803, 847–849, 907–910.

[10] The Court ignores a further reason to believe that prior to 1978, Carmack could be understood to apply to imports as well as exports. Even assuming (contrary to my view) that the relevant language in Carmack governing any international commercial exchange was the phrase "from any point in the United States to a point in an adjacent foreign country," the seemingly uni-directional "from . . . to" could reasonably have been interpreted as also encompassing "to . . . from" in light of our decision in *Galveston, H. & S. A. R. Co.* v. *Woodbury,* 254 U. S. 357 (1920). In that case, this Court interpreted similar "from . . . to" language in the jurisdictional section of the ICA as conferring jurisdiction on the ICC over all transportation *between* such countries. *Id.,* at 359–360 (construing "'transportation . . . from any place in the United States to an adjacent foreign country'" in former 49 U. S. C. §1

stead, the "adjacent foreign country" provision was expansive rather than limiting, ensuring that Carmack would apply where a shipment traveled by rail from New York City through to Montreal without stopping at the border of Canada.

Third, to the extent there are meaningful differences between the pre-1978 text of Carmack and its current text, it is the current text that we should interpret, regardless of Congress' general hortatory statement in the 1978 Public Law applicable to the entire ICA. As we have often observed, "[a] specific provision controls one of more general application." *Gozlon-Peretz* v. *United States*, 498 U. S. 395, 407 (1991). The general statement that Congress intended no change to the ICA should not require us to ignore what the current text of the specific Carmack provision says, as both Union Pacific and "K" Line explicitly ask us to do. See Brief for Petitioner in No. 08–1554, at 20 ("The Pre-1978 Statutory Language Controls This Case"); Brief for Petitioners in No. 08–1553, at 41–49 (arguing for reliance on pre-1978 text). Petitioners' view of statutory interpretation would give rise to an unwieldy—and unjust—system. I would have thought it beyond cavil that litigants are entitled to rely on the currently applicable version of enacted statutes to determine their rights and obligations.

In the final analysis, the meaning of the pre-1978 lan-

_____

to include "transportation . . . *from* that country to the United States"). Given the "presumption that a given term is used to mean the same thing throughout a statute," *Brown* v. *Gardner*, 513 U. S. 115, 118 (1994) (citing *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427 (1932)), our construction of "from . . . to" in the ICA's jurisdictional provision could reasonably have been read to sweep imports within the scope of Carmack. I would not, however, read "from . . . to" in the current version of §11706(a)(3) to encompass "to . . . from," as Congress specifically amended the similar language in the jurisdictional provision at §10501(a)(2) to "between" while leaving intact the "to . . . from" in Carmack, against the background of *Woodbury*.

guage is murky, and Congress' instruction that the 1978 recodification effected no substantive change provides no meaningful guidance. The current text does not restrict Carmack's coverage to trade with adjacent foreign countries, and it makes no distinction between imports and exports. Carmack's ambiguous history cannot justify reading such atextual limitations into the statute.[11]

## C

The Court's suggestion that its interpretation properly effectuates the goals of Carmack and "attains the most

---

[11] The United States, as *amicus* in support of "K" Line and Union Pacific, makes an effort to find such limitations in the current statutory text. See Brief for United States 21; see also Reply Brief for Petitioner in No. 08–1554, p. 10 (agreeing with the United States' interpretation). This argument is unpersuasive. The United States observes that §11706(a)(3) describes the liability of "another rail carrier over whose line or route the property is transported in the United States or *from* a place in the United States *to* a place in an *adjacent foreign country* when transported under a through bill of lading." (Emphasis added.) According to the United States, "[t]hat textual limitation, when read in light of Carmack's purpose, reflects Congress's continued intent to restrict Carmack to the carriage of goods between places in the United States and for export to an adjacent foreign country." Brief for United States 21. As I have already explained, however, once a domestic rail carrier first receives property for transportation within the United States, regardless of where the property itself originated, Carmack applies. *Supra*, at 3–6. Section 11706(a)(3) simply ensures that when a connecting carrier that neither received the property in the United States nor delivered it in the United States transports the property from the United States to either Canada or Mexico, that connecting carrier remains subject to Carmack liability during the part of the transportation that is in the United States. Further, as I explain below, see *infra*, at 18–20, Carmack's purpose would be better effectuated by applying its provisions inland as the default rule. In any event, the "adjacent foreign country" provision in §11706(a)(3) has no bearing on the rail transportation provided in these cases by Union Pacific as "receiving rail carrier," §11706(a), from California to four locations in the American midwest. To this transportation, Carmack plainly applies.

consistency between Carmack and [the Carriage of Goods by Sea Act (COGSA)]," *ante*, at 17, reflects its fundamental misunderstanding of these statutes and the broader legal context in which the international shipping industry functions. As the mandatory default regime governing the relationship between an American receiving rail carrier and its direct contracting partner (here an overseas ocean carrier), Carmack permits the shippers who contract for a through bill of lading with the ocean carrier to receive the benefit of Carmack through that once-removed relationship. Such a legal regime is entirely consistent with COGSA and industry practice.

As noted, the Court's position as to Carmack rests on its erroneous belief that the "receiving carrier" must receive the goods at the point of the shipment's origin. *Ante*, at 12–15. Because Carmack provides that suit against the receiving rail carrier "may only be brought . . . in the judicial district in which the point of origin is located," 49 U. S. C. §11706(d)(2)(A)(i), and defines "judicial district" as only a federal or state court, §11706(d)(2)(B), the Court mistakenly concludes that were Carmack to apply to inland transportation of international shipments, "there would often be no venue in which to sue the receiving carrier" because that carrier would have received the goods in a foreign country where no federal or state court exists. *Ante*, at 14–15, 17. Contrary to the Court's suggestion, however, the proper venue in which to sue a receiving carrier under Carmack is the location in which the first domestic rail carrier received the goods for domestic transportation. *Supra*, at 4–5, 9.

Nor is it true that Carmack's focus is on providing a single through bill of lading for an entire shipment. *Ante*, at 17. Carmack's purpose in §11706 is to ensure that a single bill of lading, with a single protective liability regime, governs an entire shipment by rail carrier within

the United States.[12]  It does not require the rail carrier to offer Carmack-compliant terms to anyone but the party with whom the rail carrier contracts when it receives the goods.  It does not place obligations on the relationship between any overseas carrier and any overseas shipper who operate under their own bill of lading.  That Congress expected different liability regimes to govern ocean and rail carriers can be inferred from the different regulatory oversight provided for each type of carrier—the FMC for the former, the STB for the latter, see *supra*, at 8.

Moreover, that Carmack provides certain greater protections than does COGSA demonstrates that one of Carmack's purposes—beyond simply the fact of a single bill of lading governing all rail transportation—was to specify a protective liability regime for that part of the shipment only.  As compared to COGSA, Carmack provides heightened liability rules for rail transportation, compare COGSA §4, 49 Stat. 1207, note following 46 U. S. C. §30701, p. 1179, with 49 U. S. C. §§11706(a)–(c); stricter venue requirements, compare *Vimar Seguros y Reaseguros, S. A.* v. *M/V Sky Reefer*, 515 U. S. 528, 535 (1995), with §11706(d); and more generous time allowances for filing suit, compare COGSA §3(6), at 1179, with §11706(e). Congress is evidently wary of creating broad exemptions from Carmack's regime: While Congress has given expansive authority to the STB to deregulate carriers from the requirements of the ICA, it has precluded the STB from excusing carriers from complying with Carmack.  See *infra*, at 25 (discussing §10502).  By taking Carmack's protections out of the picture for goods that travel by rail in the United States whenever the goods first traveled by ocean liner, it is the Court that "undermine[s] Carmack's purposes," *ante*, at 17.  Cf. *Reider*, 339 U. S., at 119 (apply-

―――――――

[12]A separate version of Carmack applies to motor and other nonrail carriers within the United States.  See *supra*, at 15, n. 8.

ing Carmack to domestic rail transportation of goods, even where the goods originated overseas, in order to avoid "immuniz[ing] from the beneficial provisions of the [Carmack] Amendment all shipments originating in a foreign country when reshipped via the very transportation chain with which the Amendment was most concerned").

The Court's suggestion that its interpretation best comports with the goals of COGSA fares no better. The Court is correct, *ante*, at 8, that Congress has permitted parties contractually to extend COGSA, which, by its own terms, applies only to the period "from the time when the goods are loaded on to the time when they are discharged from the ship." §§1(e), 7, at 1178, 1180. But the Court ignores that COGSA specifically contemplates that there may be "other law" that mandatorily governs the inland leg, and makes clear that contractual extension of COGSA does not trump this law. §12, at 1180 ("Nothing in [COGSA] shall be construed as superseding . . . any . . . other law which would be applicable in the absence of [COGSA], insofar as they relate to the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship"); see also Sturley, Freedom of Contract and the Ironic Story of Section 7 of the Carriage of Goods by Sea Act, 4 Benedict's Mar. Bull. 201, 202 (2006) ("It is highly ironic to suggest that section 7 was intended to facilitate the extension of COGSA [inland]. The unambiguous history demonstrates that section 7 was specifically designed to accomplish exactly the opposite result"). Notably, when it wants to do so, Congress knows how to specify that a contractual extension of COGSA supersedes other law: COGSA elsewhere defines a limited circumstance—the carriage of goods by sea between ports of the United States—in which a contractual extension of COGSA has the force of law. §13, at 1180 (providing that such bills of lading "shall be subjected hereto as fully as if

subject hereto by the express provisions of [COGSA]"). That Congress did not make the same provision for inland travel is powerful evidence that it meant for Carmack to remain the default regime on land governing the relationship between an inland rail carrier and an overseas carrier with which it directly contracted.

The Court is also wrong that its interpretation avoids the risk that two sets of rules will apply to the same shipment at different times.[13] *Ante*, at 17–18. Even under the Court's interpretation, two sets of rules may govern, because the parties need not extend COGSA to the inland leg—they may agree on any terms they choose to cover that transportation. §7, at 1180 (permitting the parties to "ente[r] into *any agreement* . . . as to the responsibility and liability of the carrier or the ship" for the period before the goods are loaded on and after they are discharged from the ship (emphasis added)); see also Train Wrecks 23 ("[C]arriers regularly include clauses in their bills of lading to limit their liability [for inland travel] in ways that COGSA prohibits"); 1 T. Schoenbaum, Admiralty and Maritime Law §10–4, p. 599–600 (4th ed. 2004) (describing typical non-COGSA liability rules parties select for the inland leg). In these cases, for example, "K" Line's bills of lading include certain terms governing the inland leg that differ from the terms governing the ocean carriage. See, *e.g.,* App. 147 (providing different time frames within which suit must be brought depending on whether the actionable conduct "occurred during other than Water Carriage").

The Court relies heavily on *Kirby* as identifying the relevant policy consideration in these cases, but it takes

—————

[13] Nor would my interpretation of the statute necessarily require that two different regimes apply to each shipment, given the parties' ability to contract around Carmack as long as they follow appropriate procedures, *infra*, at 25–27, and, if they so choose, select COGSA terms.

the wrong lesson from *Kirby*. In that case, we were concerned about displacing a single federal law, COGSA, with 50 varying state liability regimes.[14]  543 U. S., at 28–29. The rule the Court establishes today creates even greater practical difficulties than the regime we criticized in *Kirby* by displacing Carmack with as many liability rules as there are bills of lading. It would even permit different liability rules to apply to different lawsuits arising out of the same inland accident depending on where each piece of cargo originated. Contrary to the Court's view, then, the value of uniformity articulated in *Kirby* is best promoted by application of Carmack to the obligations of the rail carrier during the inland leg in these cases. Cf. *ante*, at 7–8, 17–18.

Finally, while purporting to effectuate the contractual choices of the parties in the international multimodal shipping industry, *ante*, at 17–20, the Court ignores the realities of the industry's operation. The industry has long been accustomed to drafting bills of lading that encompass two legal regimes, one governing ocean transportation and another governing inland transportation, given mandatory law governing road and rail carriage in most of Europe and in certain countries in Asia and North Africa. See generally Convention on the Contract for the International Carriage of Goods by Road, May 19, 1956, 399 U. N. T. S. 189; Uniform Rules Concerning the Contract for International Carriage of Goods by Rail, App. B to the Convention Concerning International Carriage by Rail, May 9, 1980, 1397 U. N. T. S. 112, as amended by Protocol for the Modification of the Convention Concerning International Carriage of Rail of May 9, 1980, June 3, 1999. Indeed, "K"

---

[14] *Kirby* did not address the question of Carmack's applicability to the inland leg of a multimodal international shipment traveling on a through bill of lading because that question was not presented. Brief for United States as *Amicus Curiae* in *Norfolk Southern R. Co.* v. *Kirby*, O. T. 2004, No. 02–1028, pp. 11–12; *ante*, at 2.

Line's own bills of lading evidence this practice, providing that, where an "applicable international convention or national law" exists, "cannot be departed from," and "would have applied" if a separate contract for inland carriage had been made between the merchant and the inland carrier, those laws govern "K" Line's liability. Brief for Respondents 53.

The recently signed United Nations Convention on Contracts for the International Carriage of Goods Wholly or Partly by Sea, also known as the "Rotterdam Rules," provided an opportunity for the international community to adopt rules for multimodal shipments that would be uniform for both the ocean and inland legs. See generally Train Wrecks 36–39. Instead, the final version of the Rotterdam Rules retained the current system in which the inland leg may be governed by a different legal regime than the ocean leg. See United Nations Convention on Contracts for the International Carriage of Goods Wholly or Partly by Sea, G. A. Res. 63/122, art. 26, A/RES/63/122, (Dec. 11, 2008). The Association of American Railroads and the United States, among others, advocated for this outcome.[15] See Proposal of the United States of America on the Definition of "Maritime Performing Party," U. N. Doc. A/CN.9/WG.III/WP.84, at ¶¶1–2 (Feb. 28, 2007); Proposal by the United States of America, U. N. Doc. A/CN.9/WG.III/WP.34, ¶7 (Aug. 7, 2003); Proposals by the International Road Transport Union (IRU), U. N. Doc. A/CN.9/WG.III/WP.90, ¶1 (Mar. 27, 2007); Preparation of a Draft Instrument on the Carriage of Goods [by Sea], Compilation of Replies to a Questionnaire on Door-to-Door Transport, U. N. Doc. A/CN.9/WG.III/WP.28, at 32–34, 43 (Jan. 31, 2003) (Comments on behalf of the Association of American Railroads and the International Road Transport

_____

[15] Petitioner Union Pacific is a leading member of the American Association of Railroads. Train Wrecks 37, n. 214.

Union). Thus, the Court's mistaken interpretation not only upsets domestic law but also disregards industry practice as evidenced by carefully calibrated international negotiations.[16]

## II

Because, in my view, Carmack provides the default legal regime governing the relationship between the rail carrier and the ocean carrier during the inland leg of a multimodal shipment traveling on a through bill of lading, I would reach the second question presented by these cases: whether the parties validly contracted out of Carmack. I would hold that where, as here, the STB has exempted rail carriers from Part A of the ICA pursuant to its authority as set forth in 49 U. S. C. §10502, such rail carriers may not use §10709 to opt out of Carmack entirely. Instead, such rail carriers must first offer their contractual counterparties Carmack-compliant terms for liability and claims, as §10502(e) requires. Having reached that conclusion, I would remand for consideration of whether the requirements of §10502(e) were met in these cases. I set forth these views only briefly, as the Court's determination that Carmack does not apply at all makes resolution of these questions moot.

## A

In the Staggers Rail Act of 1980, Pub. L. 96–448, 94 Stat. 1895, Congress set forth a national policy of "al-

---

[16] The Court's observation that nothing in the Rotterdam Rules "requires every country to mandate a different regime to govern the inland rail leg of an international through shipment" is irrelevant. *Ante*, at 20. The Rotterdam Rules demonstrate simply that it is common practice to have different regimes for inland and ocean transportation, so giving full effect to Carmack as the default law governing the relationship between "K" Line and Union Pacific can hardly be said to "undermine COGSA and international, container-based multimodal transport," *ante*, at 17.

low[ing], to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail" and "minimiz[ing] the need for Federal regulatory control" of the railroad industry. §101, *id.,* at 1897. Consistent with these goals, 49 U. S. C. §§10502 and 10709 provide two options for contracting around the requirements of the ICA.

Section 10502(a) provides that when certain conditions are met, the Board "shall exempt," "to the maximum extent consistent with this part," "a person, class of persons, or a transaction or service" from either a particular provision of Part A of the ICA or the entirety of that Part. Section 10502(f) specifies that "[t]he Board may exercise its authority under this section to exempt transportation that is provided by a rail carrier as part of a continuous intermodal movement." Acting pursuant to this authority, the Board has broadly exempted such transportation "from the requirements of [the ICA]." 49 CFR §1090.2 (2009). The authority to issue broad exemptions, however, is not unlimited. Under 49 U. S. C. §10502(e), "[n]o exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of [Carmack]," although, at the same time, "[n]othing . . . shall prevent rail carriers from offering alternative terms." Section 10502(g) further limits the Board from exempting rail carriers from their obligations to comply with certain employee protections under Part A of the ICA.

In turn, under §10709(a), "[o]ne or more rail carriers providing transportation subject to the jurisdiction of the Board . . . may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions." Having signed such a contract, a rail carrier "shall have no duty in connection with services provided under such contract other than

those duties specified by the terms of the contract." §10709(b). Once such a contract is made, that contract, "and transportation under such contract, shall not be subject to this part, and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of [Part A of the ICA]." §10709(c)(1).

According to Union Pacific, §10502(e) limits only the Board's exemption ability; it does not place any affirmative obligation on rail carriers to offer Carmack-compliant terms. Rail carriers, Union Pacific contends, may opt out of Carmack entirely simply by entering into a contract under §10709, thus escaping any duty imposed by Part A of the ICA. I disagree. I am persuaded by the Government's view that because the Board's order in 49 CFR §1090.2 exempted intermodal rail transportation from all of Part A of the ICA, which includes 49 U. S. C. §10709, "Union Pacific could not properly enter into a contract under Section 10709 to relieve it of its obligations under Section 10502(e)." Brief for United States 31. Those obligations require "a rail carrier providing exempt transportation [to] offer the shipper the option of contractual terms for liability and claims consistent with Carmack, presumably at a higher rate," and they permit such a rail carrier to "enter into a contract with different terms only if the shipper does not select that option." *Id.,* at 30.

Observing that the Board's exemption order relieves intermodal rail transportation from the "requirements" of Part A, Union Pacific contends that §10709 is not a requirement but a privilege and therefore is not included within the exemption. In clarifying its order, however, the Board has described the exemption as one from "regulation" under the ICA or "application" of that Act. See, *e.g., Improvement of TOFC/COFC Regulations*, 3 I. C. C. 2d, at 869–870. Especially in light of this clarification, there seems little reason to ascribe significance to the Board's

use of the word "requirements," instead of the statutory term "provision," in the exemption order.

The Government aptly describes the policy concerns that justify this reading of the interplay between §§10502 and 10709. Brief for United States 31–32. Because a rail carrier's counterparty to a §10709 contract can ordinarily require a rail carrier to comply with common carriage rates and terms under Part A (including Carmack), such counterparties possess considerable bargaining power. But rail carriers the Board has exempted from Part A under §10502 lack any obligation to comply with that Part. If exempt carriers could escape Carmack's obligations under §10709, their counterparties would be at a significant disadvantage as compared to counterparties to contracts with nonexempt carriers. Such a disadvantage cannot be squared with Congress' evident intent, as expressed in §10502(e), to ensure that no carrier may be automatically exempted from Carmack.

This interpretation of §§10502 and 10709 imposes no unfairness on exempt rail carriers. As the Court of Appeals explained, "carriers providing exempt transportation gain the benefits of deregulation, but lose the opportunity to contract for preferable terms under §10709 without first offering Carmack terms." 557 F. 3d 985, 1002 (CA9 2009). Given rail carriers' ability to charge higher rates for full Carmack coverage, see *New York, N. H. & H. R. Co.* v. *Nothnagle*, 346 U. S. 128, 135 (1953), and the likelihood that some counterparties will agree to reject Carmack-compliant terms in favor of a lower price, such a trade-off makes eminent sense.

## B

Whether Union Pacific properly contracted out of Carmack under §10502(e) requires a factual determination better suited for resolution by the District Court in the first instance. Accordingly, I would remand for considera-

tion of that issue.  Cf. 557 F. 3d, at 1003.  Union Pacific also raises a related legal argument not decided by the courts below: that the forum selection clause at issue in these cases is valid because venue is not encompassed within the phrase "contractual terms for liability and claims" in §10502(e).  To the extent this argument is not waived, it would also be properly considered on remand.

\*　　\*　　\*

In endorsing a strained reading of the text, history, and purpose of Carmack, the Court is evidently concerned with a perceived need to enforce the COGSA-based contracts that the "sophisticated cargo owners" here made with "K" Line.  *Ante*, at 18.  But these cases do not require the Court to interpret or examine the contract between the cargo owners and "K" Line.  The Court need consider only the legal relationship between Union Pacific and "K" Line as its direct contracting party.  As to that relationship, it bears emphasizing that industry actors on all sides are sophisticated and can easily adapt to a regime in which Carmack provides the default rule governing the rail carrier's liability during the inland leg of a multimodal shipment traveling on an international through bill of lading.  See, *e.g.,* Train Wrecks 40 (describing how ocean and rail carriers have drafted their contracts to account for—and permissibly escape—Carmack's applicability); cf. *Kirby*, 543 U. S., at 36 (recognizing that "our decision does no more than provide a legal backdrop against which future bills of lading will be negotiated").  In disregarding Congress' commands in both Carmack and COGSA and in discounting the practical realities reflected in the Rotterdam Rules and other international conventions governing the carriage of goods, the Court ignores what we acknowledged in *Kirby:* "It is not . . . this Court's task to structure the international shipping industry."  *Ibid.*  I respectfully dissent.